McMahon, Chief Judge
Plaintiffs Navajo Air, LLC ("Navajo") and Santee Print Works, ("Santee") (collectively, "Plaintiffs") brought this suit against Defendants Crye Precision, LLC and Lineweight, LLC (collectively "Crye" or "Defendants") under the (i) trademark laws of the United States, Lanham Act, 15 U.S.C. § 1051 et seq. , and the (ii) patent laws of the United States, 35 U.S.C. § 1 et seq. ; 28 U.S.C. § 1338(b) with respect to unfair competition; and (iv) under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.
Before this court is Plaintiffs' motion for summary judgment and Defendants' cross-motion for summary judgment on Counts Three, breach of contract and Count Four, tortious interference, pursuant to Fed. R. Civ. P. 56. (Dkt. No. 54.); (Dkt. No 61.)
For the reasons discussed below, Plaintiffs' motion is GRANTED and Defendants' cross-motion is DENIED.
Background[1]
Parties and Background Facts; Patents and Relevant Licensing Agreements
Defendant Crye, the licensor in this dispute, is a limited liability corporation and *643 creator of a camouflage pattern known as MultiCam. (Pls.' 56.1 ¶¶ 6-10.) MultiCam is subject to at least one United States utility patent, Utility Patent No. D 592,861, which is owned by Defendant Lineweight, an entity related to Crye. (Defs.' 56.1 ¶¶ 67-68; Thompson Decl. ¶ 7.) Defendants will be referred to collectively as "Crye".
Prior to 2014, the Government required Army Combat Uniforms ("ACU") to be printed in the MultiCam pattern. (Pls.' 56.1 ¶ 9.) Defendant licensed textile printers to print and sell fabric in MultiCam for orders placed on behalf of the United States Government ("USG"). Defendants also licensed MultiCam for commercial uses. (Thompson Decl. ¶ 11.)
Plaintiff Navajo is a textile converter. It sells fabric to contractors ("Prime Contractors") who make ACU's for the Government ("USG"). (Chornyei Decl. ¶ 2.)
Plaintiff Santee, the licensee, is a commissioned fabric printer and finisher. (Pls.' 56.1 ¶¶ 4-5.) It was Navajo's source for the fabric at issue in this case. From 2012 until 2016, Santee was licensed to use Crye's patented MultiCam pattern, pursuant to two successive licenses. (Pls.' 56.1 ¶¶ 11-12, 35.)
Navajo sent its fabric to Santee to be printed with a camouflage pattern; the fabric was then returned to Navajo to be sold to the uniform manufacturers. Navajo used Santee as its exclusive fabric printer. (Chornyei Decl. ¶¶ 4-5.) While not itself a Crye licensee, Navajo plainly benefitted from that license; indeed Navajo alleges that Santee entered into the agreement at the behest of its customer, Navajo. (Chornyei Decl. ¶ 10.)
The first of the two licensing agreements between Santee and Crye was executed in 2012.[2] (Chornyei Decl. ¶ 12.) Per the 2012 License, Santee paid royalties to Defendant for use of the MultiCam design. (Pls.' 56.1 ¶ 12.) Although it was not a party to the licensing agreements, Navajo alleges that all payments due to Crye under the licenses were actually paid by Navajo, in that Navajo reimbursed Santee for all royalties paid to Crye. (Chornyei Decl. ¶ 11.)
Crye and Santee entered into a second two year licensing agreement on October 27, 2014, after the 2012 license expired. (Chornyei Decl. ¶ 19.) The new agreement (hereinafter, "the 2014 License") also provided for the payment of royalties to Defendants, and Navajo again reimbursed Santee for payments that were remitted to Crye. (Chornyei Supp. Decl. ¶ 10.) The 2014 Agreement expired on October 28, 2016. (Pls.' 56.1 ¶ 39; Thompson Decl. ¶ 30.)
The 2014 license includes two covenants that are of potential relevance to this case. Section 6.3 of the 2014 License Agreement provides:
Upon termination of this Agreement for any reason, any and all rights acquired by Licensee relating to the practice of the IP shall terminate and cease absolutely, and Licensee shall immediately cease all sales of the Products. In addition, within thirty (30) days after the termination of this Agreement, Licensee shall remit to Crye any unpaid and outstanding License Fees and submit a written statement sworn by an officer of Licensee attesting that the obligations set forth in this Section 6.3 have been met. (Thompson Decl. ¶ 25, Ex. B § 6.3.)
Section 7 of the 2014 License Agreement provides:
*644 Restriction on Similar Products. Except for the Products for which Crye shall be entitled to receive Licensing Fees, Licensee agrees that it shall not, at any time during the term of this Agreement or at any time thereafter, make or provide, or assist or encourage others to make, products which are confusingly similar in design or appearance (i.e., color palette, arrangement or placement of elements) to, or which constitute derivative works of, any of the IP. (Thompson Decl. ¶ 25, Ex. B § 7.)
Schedule B attached to the 2014 License lists the "Products" that are covered by the license, and which are referred to in the two clauses quoted above. One is Multi-Cam; another is a second camouflage pattern, Scorpion W2, better known as "OCP". (Thompson Decl. Ex. B, Schedule B.). Santee agreed to license OCP as a product because Crye represented that it owned intellectual property rights in OCP. (Sheehan Decl. ¶ 4.)
OCP is also listed on Schedule E, which identifies the "Licensing Fees" for particular products. (Thompson Decl. Ex. B, Schedule E.) OCP is only identified in the section headed "Government Sales," and the licensing fee is specifically identified as a "Government Sale Licensing Fee."
However, as it turns out, Crye does not own OCP - the USG does, at least insofar as the United States Patent and Trademark Office and the United States Army are concerned. (Clark Decl. Ex. 2, Ex.3, Ex.4, Ex.5.)
In December 2014, the Government (in the person of the Secretary of the Army) applied for two patents - one for the camouflage OCP, and one for uniforms made from OCP. Those two patents - Numbers 9,062,938 B1 and 9,074,849 B1 - issued on June 23, 2015 and July 7, 2015, respectively. (Clark Decl. ¶¶ 2-3, Ex.1, Ex.2.) (Pls.' 56.1 ¶ 15.) The listed inventors designated the United States of America, as represented by the Secretary of the Army as a sole assignee. (Clark Decl. Ex.1, Ex.2.)
In May of 2015 the Government applied for two more patents on variations of the OCP pattern, both for the print and for uniforms made out of the printed fabric; those two applications also listed MultiCam as prior art. (Pls.' 56.1 ¶ 23.) These two patents are numbered 9,631,900 B1 and 9,746,288 B1, respectively. (Clark Decl. Ex. 3, Ex. 4.) They issued in April and August of 2017 - after the expiration of the Second License between Crye and Santee. Again, the inventors assigned all right, title and interest in the patents to the USG, as represented by the Secretary of the Army.
The patents were granted over Crye's '861 Patent, which was specifically identified as "prior art." The patent specifications describe in detail the differences between OCP and MultiCam that would allow the newer pattern to be patented over the prior art pattern. Obviously, the PTO agreed with the Government's assessment that OCP was sufficiently different from and an improvement over MultiCam to allow the patents to issue.
The patents provide that, "The invention described herein may be manufactured and used by or for the U.S. Government for governmental purposes without payment of any royalties thereon or therefor."
Crye "disputes" these facts, contending that Plaintiffs' representatives are not competent to testify about the various patents. The argument is frivolous and does not create any genuine issue of material fact for purposes of this motion. The patents are Government-issued documents; they are admissible as public records pursuant to Fed. R. Ev. 803(8) ; and they speak for themselves. The patents indicate that the USG, not Crye, owns the OCP design, and that the United States Patent and Trademark Office was well aware of *645 the existence of Crye's patents when it granted the OCP patents. Crye offers no evidence to support its contention that it has any rights in the pattern. (Pls.' 56.1 ¶ 21.) In particular, Crye has not proven (or even tried to prove) that the USG's OCP patents are invalid; as far as the court is aware, it has not brought suit to invalidate the patents. (Pls.' 56.1 ¶¶ 21-22.) It attached photographs that purportedly attest to the similarity between the two camouflage patterns, but the PTO, which was aware of the prior art, chose to issue the utility patents; until the patents are invalidated (which they cannot be in this lawsuit) that is the end of the matter.
The Dispute Underlying this Lawsuit
In the spring of 2014, the Government announced that it was switching from MultiCam to OCP for use in Army uniforms. (Defs.' 56.1 ¶ 83; Thompson Decl. ¶ 14.) Since the switch was made, OCP is the only camouflage pattern being procured by the Government for this purpose. (Chornyei Decl. ¶ 7.)
After the government announced its switch, Navajo entered into an agreement with the Government to use OCP. (Chornyei Supp. Decl. ¶ 7.) This was after Santee entered into the Second Agreement with Crye, and before any of the four patents discussed above were issued to the Secretary of the Army.
Navajo received digital print files of OCP from the Government, which it sent to Santee. Santee printed fabric using OCP. Navajo then sold that printed fabric to the USG via its Prime Contractors. (Chornyei Decl. ¶ 17, 21; Chornyei Supp. Decl. ¶ 8, Ex. 2.)
Notwithstanding the fact that (1) the Government owned the patents, and (2) the patents stated clearly that no royalties could be paid when the pattern was manufactured and used by the Government for its own purposes, Santee paid Defendant licensing fees, per the terms of the 2014 License, from the time that Navajo started supplying the USG with fabric printed in OCP until the expiration of Santee's 2014 License on October 28, 2016. (Defs.' 56.1 ¶ 92; Chornyei Supp. Decl. ¶ 10.) These royalties were paid to Crye at the "Government Sale Licensing Fee" rate in Schedule E. They were paid even though Navajo's customers (the Prime Contractors) were not permitted to pay, directly or indirectly, any royalty to a third party for the use of OCP in fulfilling USG orders for the fabric.
The 2014 License expired on October 28, 2016. Per the terms of the license, Santee gave Crye thirty days' notice that it did not wish to renew the license. (Pls.' 56.1 ¶ 39; Chornyei Supp. Decl. ¶ 11.) Defendant confirmed the termination of the license. (Chornyei Decl. ¶ 28 Ex. B.)
Since that time, Santee has continued to print OCP for Navajo. From and after the expiration of the 2014 License, it has not paid Crye licensing fees. (Defs.' 56.1 ¶¶ 111-112.)
Crye has since demanded, on at least three occasions since the Second Agreement terminated, that Santee submit a sworn written statement in accordance with Section 6.3 of the agreement stating that Plaintiff has ceased all sales of the "Products" covered by the 2014 License. (Thompson Decl. ¶ 31, Exs. D and E.) Needless to say, Santee has not submitted any such statement, because it is printing one of the "Products" - OCP.
Crye has also demanded that Santee pay it licensing fees for the use of OCP after expiration of the contract. Santee has refused to comply with that demand as well. (Defs.' 56.1 ¶ 112.)
The Instant Lawsuit
Plaintiff Navajo Air, LLC ("Navajo") filed a complaint with this court on December 22, 2016. (Dkt. No. 1.) On March 3, *646 2017 Plaintiff filed an amended complaint, adding Santee as an additional Plaintiff. (Dkt. No. 27.)
The amended complaint seeks a declaration that Plaintiffs' use of OCP on fabrics printed for use by the USG does not (1) infringe upon Crye's trade dress rights; (2) infringe upon Crye's patent rights (3) breach any contractual obligation Santee may have to Crye; (4) tortiously interfere with any of Crye's contract or prospective business advantages; or (5) constitute unfair competition. (Dkt. No. 27.)
Plaintiffs contend that Covenants 6.3 and 7 in the 2014 Licensing Agreement are unenforceable. Navajo alleges that it will go out of business if it cannot sell OCP to the Government without paying Crye's royalties, because it cannot obtain reimbursement for the royalties and it cannot afford to absorb that cost itself. (Pls.' 56.1 ¶ 49; Chornyei Decl. ¶¶ 23, 32, 34-35.) Santee alleges that if it is not able to print OCP it will lose the Navajo contract, which would work a substantial hardship on it. (Pls.' 56.1 ¶ 50; Sheehan Decl. ¶ 6.) Both parties claim that having to pay Crye a royalty on OCP would effectively preclude them from supplying finished fabric for Army uniforms to the USG. (Chornyei Supp. Decl. ¶ 13.)
Crye denies the allegations of the Amended Complaint. It argues that Santee should continue to be bound by the agreement that it made, and so is altogether barred from printing fabric using OCP, because its license to do so has expired.
In the alternative, if Section 6.3 were to be unenforceable in light of the Government's ownership of the patent for OCP, Crye urges that Santee must continue to pay it a licensing fee, per Section 3.5 of the agreement, which provides:
Licensee's obligations to pay the Licensing Fees shall survive termination or expiration of this agreement and shall continue for as long as Licensee continues to manufacture Products . (Thompson Decl. ¶ 24, Ex. B § 3.5.)
The Instant Motion
Plaintiffs move for partial summary judgment on Counts Three and Four. They seek a declaration (1) that Crye cannot enforce any contractual prohibition on Santee's ability to print fabric with OCP; and (2) that Navajo is not tortiously interfering with Crye's contract rights or its prospective business advantage by obtaining OCP-printed fabric from Santee. (Dkt. No. 55.) Defendants cross-move for summary judgment on the same counts, seeking their dismissal. (Dkt. No. 61.)
Prior Litigation in Other Courts
Crye's licensing agreement with other manufacturers has been the subject of two prior lawsuits - one in the Eastern District of New York and one in the Southern District of New York - and one appeal to the Second Circuit.
In Crye Precision LLC v. Duro Textiles, LLC, 2016 WL 1629343, 2016 U.S. Dist. LEXIS 54201 (S.D.N.Y. 2016), Crye sued Duro, another former licensee, seeking to stop it from printing fabric using OCP on the ground that it was "similar" to the pattern Duro had been printing under license from Crye. Unlike in this case, OCP was not a "Product" covered by Duro's license agreement with Crye.
My colleague Judge Cote held that Section 3(h) of Duro's license agreement with Crye - which is similar to Section 7 of the license agreement in this case, in that it prohibited Duro from printing fabric with "similar" camouflage patterns following the termination of its license - was unenforceable, because it was overbroad and unreasonable and could be read to prevent Duro from printing any camouflage pattern, including OCP. Id. at *5-6, 2016 U.S. Dist. LEXIS 54201 at *15. The Second Circuit affirmed Judge Cote's decision in *647 Crye Precision LLC v. Duro Textiles, LLC , 689 Fed.Appx. 104, 106 (2d Cir.2017).[3]
In Crye Precision v. Bennettsville Printing , 2017 WL 4325817 *2-3, 2017 U.S. Dist. LEXIS 159072 *6 (E.D.N.Y. 2017), Judge Block held that Section 7 of Bennettsville's license, (which was similar to Section 3(h) of the Duro license and is identical to Section 7 of the license agreement in this case) was similarly unenforceable. Crye sued Bennettsville to stop it from printing fabric using OCP on the ground that OCP was "confusingly similar" to the pattern that Bennettsville had been printing under license from Crye. As was the case in Duro , OCP was not a "Product" covered by Bennettsville's license.
Judge Block concluded that Section 7 of Bennettsville's license agreement suffered from the same problems of Section 3(h) in Duro - it was unenforceable because it was unreasonably expansive, and because it effectively precluded Bennettsville from printing camouflage fabric for the Army, thereby causing excessive hardship. Id. at *7-8, 2017 U.S. Dist. LEXIS 159072 at *21. While noting that Section 7 of Bennettsville's license used the phrase "confusingly similar," while Section 3-h of Duro's license said "similar," Judge Block readily concluded that this minor discrepancy made no difference to the result, because the clause could still be read to prevent Bennettsville from printing any camouflage pattern. Id. at *8, 2017 U.S. Dist. LEXIS 159072 at *22-23. Crye's complaint was dismissed. The decision was not appealed.
Neither previous case considered the implication of any provision similar to Section 6.3 of Santee's license, because no provision identical or similar to Section 6.3 was included in either Duro's or Bennettsville's license. Moreover, OCP was not listed as a covered "Product" in either Duro's or Bennettsville's license. (Thompson Decl. ¶ 13.)
Applicable Legal Standard
Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; see also Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Facts are material if they might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is precluded when a dispute over a material fact is such that "a reasonable jury could return a verdict for the nonmoving party. Id. The burden on a motion for summary judgment initially rests on the moving party to show that there is no genuine dispute over a material fact. Celotex Corp. v. Catrett , 477 U.S. 317, 330-31, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
A court will look at the evidence in the light most favorable to the non-moving party when determining if there is a dispute *648 over a material fact. Anderson, 477 U.S. at 255, 106 S.Ct. 2505. Once the moving party has shown there is no dispute, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Electric Ind. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat summary judgment, the non-moving party must do more than show that "there is some metaphysical doubt as to the material facts." Id. at 586, 106 S.Ct. 1348. There must be specific facts that show that there is a genuine issue for trial. Beard v. Banks , 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). "Summary judgment is designed ... to flush out those cases that are predestined to result in directed verdict." Lightfoot v. Union Carbide Corp. , 110 F.3d 898, 907 (2d Cir. 1997).
Discussion
1. Plaintiff is Not in Breach of Contract - Section 7
Plaintiff argues that it cannot possibly be in breach of the contract, because Section 7 has been held to be unenforceable against other manufacturers that have printed fabric with OCP for use in military uniforms. Because OCP is a camouflage print that is expressly covered by its license - which was not the case in either Duro or Bennettsville - Plaintiff is unable to argue that relitigation of this issue is precluded under the doctrine of offensive collateral estoppel.[4] Instead, Santee argues that Section 6.3 and Section 7, read together, are an attempt to protect Crye's intellectual property rights in OCP, which arise (despite the Government's patent) because, according to Crye, OCP is "derived" from MultiCam. Santee urges that Section 6.3 is simply an "extension" of Section 7, and that the latter provision has already been found to be unenforceable in the other cases.
Defendants argue that the enforceability of Section 7 is irrelevant to this case, because Santee is in breach of Section 6.3, not Section 7. I agree that Section 7 is irrelevant to this case. Plaintiff could not possibly be in breach of Section 7 of the 2014 License Agreement, because Section 7 of Santee's license has nothing to do with Santee's printing of OCP.
Section 7 prohibits Santee from making products that are "confusingly similar to" or "derived from" Crye's "IP" (i.e., intellectual property). OCP cannot possibly be "confusingly similar" to a product covered by Santee's license, because OCP IS a product covered by Santee's license. It is listed as a product covered by the license in Schedule B; it is listed in Schedule E as a product on which Crye is entitled to receive licensing fees. Section 7 by its terms applies only to products that are not covered by the license; it begins: "Except for the Products for which Crye shall be entitled to receive Licensing Fees....." (Thompson Decl. ¶ 25, Ex. B Schedule E.). Since Section 7 applies only to products that are confusingly similar to those listed *649 in Schedules B and E - not to the Schedule B/E products themselves - Section 7 does not prohibit Santee from printing OCP - only from printing fabrics that are "confusingly similar" to OCP. It follows that Santee cannot possibly be in breach of Section 7 by printing fabric in OCP for Navajo.
2. Plaintiff is not in Breach of Contract - Section 6.3
So we turn to Section 6.3 - a provision that was not considered in either of the previous cases.
Section 6.3 states that, upon termination of the 2014 License Agreement, Santee "shall immediately cease all sales of the Products." As noted above, OCP is a "Product" for purposes of this license.
Defendants argue that Santee is violating Section 6.3 of the 2014 License by printing OCP camouflage for Navajo. (Pls.' 56.1 ¶¶ 36-38; Thompson Decl. Ex. B, Schedule B.) Crye argues that Section 6.3 of the license is enforceable because it differs from the broad restrictive covenants that were held to be unenforceable in Duro and Bennettsville , in that it is "narrowly tailored" to protect Crye's "intellectual property" in identified "Products."
Santee is unquestionably violating the literal terms of Section 6.3 by printing OCP for Navajo. However, the post-termination restrictive covenant that prohibits it from printing the pattern is not enforceable, because it does not further any legitimate business interest of Crye's.
Whether a restrictive covenant is enforceable depends in part upon the nature of the underlying contract. DAR & Assocs., Inc. v. Uniforce Servs., Inc. , 37 F.Supp.2d 192, 196 (E.D.N.Y. 1999). New York courts have enforced restrictive covenants in three kinds of contracts: (1) contracts for the sale of businesses; (2) employment contracts; and (3) ordinary commercial contracts. Mathias v. Jacobs , 167 F.Supp.2d 606, 610 (S.D.N.Y. 2001). This case concerns a license agreement, which is a kind of ordinary commercial contract. The applicable rules are those that apply to the enforcement of restrictive covenants in ordinary commercial contracts.
A non-compete within an ordinary commercial contract is analyzed "under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract." DAR & Assocs., Inc. v. Uniforce Servs., Inc., 37 F.Supp.2d 192, 197 (E.D.N.Y. 1999) ; see also Winston Franchise Corp. v. Williams , 1992 WL 7843 at *6-7, 1992 U.S. Dist. LEXIS 216 at *16 (S.D.N.Y. 1992). New York courts will look at the totality of the circumstance when determining if a restrictive covenant in a commercial agreement is enforceable. Crye Precision LLC v. Duro Textiles, LLC , 689 Fed.Appx. 104, 106 (2d Cir. 2017) ; see BDO Seidman v. Hirshberg , 93 N.Y.2d 382, 390, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999). The covenant must be "reasonable." See BDO Seidman, 93 N.Y.2d at 388-89, 690 N.Y.S.2d 854, 712 N.E.2d 1220 ("New York has adopted this prevailing standard of reasonableness in determining the validity of employee agreements not to compete.") Courts will consider if the covenant: (1) protects a legitimate business interest; (2) is reasonable in regard to geographic scope and temporal duration; and (3) the degree of hardship imposed upon the party against whom the covenant is enforced. Crye Precision LLC v. Duro Textiles, LLC , 2016 WL 1629343 at *5, 2016 U.S. Dist. LEXIS 54201 at *13-14 (S.D.N.Y. 2016), aff'd 689 Fed.Appx. 104 (2d Cir. 2017).
In this case, Section 6.3 is not enforceable because it violates the first standard.
*650 A. Section 6.3 Does Not Protect a Legitimate Business Interest
The principal question posed by this case is whether the restrictive covenant in Section 6.3 protects some legitimate business interest of Crye's. It does not.
The protection of trade secrets and the prevention of unfair competition - which is the misappropriation of someone else's commercial advantage or of the property rights belonging to another - are examples of legitimate business interests. Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann, 730 F.Supp. 1209, 1215 (E.D.N.Y. 1990) (citing American Inst. of Chem. Eng'rs v. Reber-Friel Co. , 682 F.2d 382, 387 (2d Cir. 1982). The covenant may not merely insulate a party from competition; however, can protect a business's good will or know-how. American, 682 F.2d at 387 ; DAR , 37 F.Supp.2d at 199.
So if Crye had an IP interest in OCP, Section 6.3 could be relied on to protect that interest, by restricting a former licensee from printing it without permission after the license expired.
But Crye does not have a protectable interest in OCP. The United States Government owns the patents on OCP. The patent was granted over Crye's prior art, which was distinguished, in great detail, in the patent's specifications. Unless and until Crye convinces a court of law that the OCP patents were invalidly granted and should be set aside - something it has not purported to do - it has absolutely no intellectual property rights in that pattern, or in fabric made from that pattern for use by the United States Army. Where OCP is concerned, it has nothing to protect. Therefore, Section 6.3 does not further any legitimate business interest of Crye's.
Crye has submitted to the court photographs which allegedly demonstrate that OCP is similar to MultiCam. (Thompson Decl. ¶ 15.) I rather imagine that most camouflage patterns look a great deal alike to the naked eye. But the United States Patent and Trademark Office concluded that the United States was entitled to a utility patent on the OCP camouflage pattern. It did so in light of and over MultiCam as "prior art." The patents outline the various ways in which OCP differs from MultiCam. For example, OCP, unlike MultiCam, is made up of light and dark color gradient portions that are generally uniform across the entirety of the warp and fill direction in the brown layer of a single pattern repeat. MultiCam, by contrast, has a random pattern distribution for light and dark color gradients. See U.S. Patent No. 9,062,938 B1 (filed Dec. 12, 2014). The patent examiner was persuaded by the Government's showing to grant the patent over the prior art.[5] That is the end of the matter - unless Crye gets the PTO's decision overturned. This lawsuit is not the vehicle for doing so.
Crye then argues that Santee is estopped from denying that it has a defensible IP interest in OCP because it took a license from Crye that covered OCP. (Thompson Decl. ¶¶ 17-18.) I assume that Crye is invoking the doctrine of licensee estoppel, which prohibits a licensee from contesting the validity of the intellectual property within a license in future disputes. Idaho Potato Comm'n v. M & M Produce Farm & Sales , 335 F.3d 130, 134 (2d Cir. 2003). However, the doctrine of licensee estoppel is equitable in nature and not subject to rigid application.
*651 Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc. , 153 F.Supp.2d 512, 520 (S.D.N.Y. 2001) ; See also Restatement (Third) Unfair Competition, § 33, comment d. Judge Cotes held in Duro that estoppel "cannot be used to enforce contract provisions that contravene public policy." Duro Textiles , 2016 WL 1629343 at *6, 2016 U.S. Dist. LEXIS 54201, at *16. The covenant is contrary to public policy, in that its enforcement would allow Crye to restrict competition without having any legitimate business interest in OCP. Therefore, Santee is not estopped to assert that Crye has not rights in OCP.
B. The Covenant Cannot Be Modified to Make It Enforceable
Crye asks that the court modify Section 6.3 to the extent necessary to render it enforceable. This the court cannot do.
Section 14.4 of the agreement states that the agreement "will be modified to the least extent necessary to make it enforceable." (Thompson Decl. Ex. B § 14.4.) Essentially, Crye asks the Court to use a judicial "blue pencil," which allows a court to partially enforce a restrictive covenant if "the unenforceable portion is not an essential part of the agreed exchange." Duro, 689 Fed.Appx. at 107 ; See also BDO Seidman , 93 N.Y.2d at 394, 690 N.Y.S.2d 854, 712 N.E.2d 1220. However, it is impossible to modify this covenant to render it enforceable, since the covenant tries to protect a non-existent business interest of Crye's.
C. Plaintiff is not in Breach of Section 3.5 of the License, Because That Section is Also Unenforceable
In a desperate attempt to capitalize off OCP, Defendants argue that Santee is still bound to pay it royalties because of Section 3.5 of the 2014 License Agreement. That provision provides that "Licensee's obligation to pay the Licensing Fees shall survive expiration or termination of the Agreement and shall continue for as long as Licensee continues to manufacture products ." (Thompson Decl. Ex. B § 3.5.)(Emphasis added)
Defendants argue that Section 3.5 is not a restrictive covenant, so its enforceability cannot be analyzed in light of the factors discussed above. Plaintiffs argue that Section 3.5 is a "restrictive covenant" because it "restricts" the ability of the plaintiffs to do business with the Government. The "restriction" they identify is their inability to recover from their customer (the USG) any royalties that Santee may have to pay to Crye pursuant to the 2014 License. Navajo argues that having to absorb the cost of the royalty would make it impossible to do business with the Army's Prime Contractors. (Chornyei Supp. Decl. ¶ 13.)
Section 3.5 is not a restrictive covenant. However, it is unenforceable because Crye offers Santee no consideration for the royalties it is trying to collect.
Consideration consists of "some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." United States v. Toscano (In re Toscano) , 799 F.Supp.2d 230, 248 (E.D.N.Y. 2011) ; see Restatement, Contracts 2d, § 75. When one party licenses another to use its intellectual property, it gives the licensee the right to use something in exchange for a payment.
But a license agreement fails for want of consideration if the Licensor has no valid intellectual property to license to its Licensee. Licensing of Intellectual Property § 1.05. And a patentee may not use the power of its patent to levy a charge for making, using, or selling products not within the reach of the monopoly. Veltman v. Norton Simon, Inc. , 425 F.Supp. 774, 775 (S.D.N.Y. 1977).
*652 As we have seen, to the extent that the 2014 License Agreement purported to apply to OCP, Crye had nothing to give Santee in exchange for a royalty, because the USG, not Crye, owns the intellectual property in OCP. Defendants are not entitled to collect royalties in exchange for nothing. And given who owns the patent on OCP, "nothing" is what Santee would be getting from Crye in exchange for the post-termination royalty payments it seeks to extract.
Ownership of the Multi-Cam patent does not permit Crye to charge a royalty for the manufacture of OCP, because OCP is not within the reach of MultiCam's monopoly. The creator of "prior art" is not entitled to collect royalties on a product that constitutes a sufficient advancement over that prior art to warrant the issuance of an entirely new patent over the prior art.
Therefore, to the extent that defendants seek to enforce Section 3.5 in connection with Santee's printing of OCP, the 2014 License Agreement is unenforceable.
Of course, Section 3.5 is not entirely unenforceable; if Santee continued to print MultiCam after the expiration of the license, it would of course owe Crye royalties. However, it appears to be undisputed that Santee has not printed MultiCam since termination of the agreement; it is only printing OCP, which Crye does not own. Therefore, the fact that Section 3.5 remains enforceable in the context of MultiCam is of no relevance to the outcome of this lawsuit.
In light of the above analysis, Santee is entitled to a declaration that it is not violating any enforceable provision of the 2014 Licensing Agreement by printing fabric with OCP for Navajo. Santee's motion for summary judgment on the Third Cause of Action is granted; Defendants' cross motion for summary judgment is denied.
Count 4: Tortious Interference
Navajo is the plaintiff on Count 4. It moves for summary judgment declaring that its obtaining of OCP-printed fabric from Santee does not constitute tortious interference with any contract (i.e., the 2014 License Agreement), or with Crye's prospective economic advantage. (Dkt. No. 27.)
Navajo's motion is granted.
A. Tortious Interference With a Contract
To establish tortious interference with a contract under New York Law, a party must establish that: (1) a valid and enforceable contract exists between the plaintiff and a third party; (2) the defendant knows about the contract; (3) the defendant intends to procure one party to breach the contract; and (4) the other party to the contract is damaged thereby. White Plains Coat & Apron Co. v. Cintas Corp. , 460 F.3d 281, 285 (2d Cir. 2006). Here, Navajo wins because Crye fails at Step 1 - there is no valid and enforceable contract between Santee and Crye that either prohibits Santee from printing OCP on fabric for Navajo or that requires Crye to pay royalties thereon. Since there is no such contract, Navajo cannot have tortiously interfered with it. As held by my esteemed former colleague, Magistrate Judge Theodore Katz, in Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC , 813 F.Supp.2d 489, 532 (S.D.N.Y. 2011), one cannot interfere with an invalid and unenforceable contract.
B. Tortious Interference With Prospective Economic Advantage
To establish tortious interference with prospective economic advantage, a party must allege: "(1) [it] had business relations with a third party; (2) the defendant interfered with those business relations;
*653 (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C. , 455 Fed.Appx. 102, 105 (2d Cir. 2013) (quoting Catskill Dev., L.L.C. v. Park Place Entm't Corp. , 547 F.3d 115, 132 (2d Cir. 2008) ).
Although the Fourth Cause of Action pleads tortious interference with both contract and prospective business advantage, neither side addresses the "prospective business advantage" aspect of the pleading in its briefs. I thus consider the argument abandoned. (Amended Complaint ¶ 4; Dkt. No. 55; Dkt. No. 61.)
In any event, there can be no tortious interference where, as here, Navajo did not act for a wrongful purpose. On the undisputed record before the court, Navajo was trying to protect its own business interests when it contracted with Santee to print fabric for it - specifically, its ability to sell OCP-printed fabric to the Army's Prime Contractors. Navajo's evidence establishes without contradiction that (1) it could not legally charge the Government for the cost of any royalty that had to be paid to some third party; and (2) it would have lost money if it had to absorb the cost of such a royalty. (Chornyei Supp. Decl ¶ 13.) Especially since it is undisputed that the USG owns the patent on the OCP pattern, Navajo's entering into a supply contract with Santee (1) for OCP, and (2) without making provision for payment of a royalty to Crye cannot be said to have been for a wrongful purpose or using dishonest, unfair or improper means. Indeed, it appears that the only improper means in this case arise out of Crye's attempt to obtain a royalty for a utility-patented pattern it did not own.
CONCLUSION
Plaintiffs motion for summary judgment on Counts 3 and 4 are GRANTED; Defendants' cross-motions are DENIED.
The Clerk of the Court is directed to remove Dkt. No. 55 and Dkt. No. 61 from the Court's list of pending motions.
There remain a number of open counts. In light of this decision, however, it is far from clear whether there is anything left of this case. The parties have until July 19, 2018, to explain to the court what remains to be done.

The following facts are from Plaintiffs' Rule 56.1 Statement of Material Facts ("Pls.' 56.1") and Defendants' Rule 56.1 Statement of Material Facts ("Defs.' 56.1"). References to Plaintiffs' 56.1 are either undisputed by Defendants' in their 56.1 statement or supported in the Declaration of Ernest Chornyei ("Chornyei Decl."), Supplemental Declaration of Ernest Chornyei ("Chornyei Supp. Decl."), or the Sheehan Declaration ("Sheehan Decl."). References to Defs.' 56.1 are either undisputed or supported in the ("Thompson Decl.").

The record does not reveal the exact dates on which the 2012 License began and ended. Neither party disputes that there was a two-year license agreement that began in 2012 and ended in 2014.

The exact wording of Section 3(h) of the Duro License Agreement is as follows: "Intellectual Property. [Duro] acknowledges and agrees that it will not disassemble, decompile, or reverse engineer MULTICAM or any other intellectual property right of Crye, including patent, trademark and copyrights, licensed from CRYE or during or after the term or expiration of this Agreement, make any products that are similar to MULTICAM through color palette, pattern or arrangement of placement of any elements incorporated in MULTICAM. Furthermore, [Duro] agrees that it shall not make any additions to, new renderings of, or modifications, embellishments, derivative works or other changes of or to MULTICAM or any other intellectual property rights of CRYE without CRYE's prior written consent and [Duro] agrees that all such additions, renderings, modifications, embellishments, derivative works or otherwise shall be and remain sole property of Crye."Duro, 2016 WL 1629343 at *2, 2016 U.S. Dist. LEXIS 54201 at *3-4.

Collateral estoppel permits a plaintiff to foreclose the relitigation of an issue previously lost by a defendant in an action with another party. Coleco Indus. v. Universal City Studios Inc. , 1986 WL 1809 at *3, 1986 U.S. Dist. LEXIS 29724 at *8 (S.D.N.Y. 1986). The issues - which includes the underlying legal issue and factual findings - must have been identical. Id. at *5-6, 1986 U.S. Dist. LEXIS 29724 at *15. "Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." Crye Precision LLC v. Bennettsville Printing , 2017 WL 4325817 at *5, 2017 U.S. Dist. LEXIS 159072 at *13 (E.D.N.Y. 2017) ; Evans v. Ottimo , 469 F.3d 278, 281 (2d Cir. 2006).

The patent also distinguished other Crye camo patterns from OCP, including those covered by the '915 and the '900 utility patents.